CHARLES A. LINEHAN AND MARION S. LINEHAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71629. Filed December 30, 1960.

*James D. Dow, Esq.*, for the petitioners.
*Douglas D. Robertson, Esq.*, and *Charles T. Shea, Esq.*, for the respondent.

WITHEY, *Judge:* Deficiencies have been determined by respondent against petitioners for the years and in the amounts which follow:

| Year | Deficiency |
|------|-----------|
| 1953 | $268.92 |
| 1954 | 2,417.81 |
| 1955 | 1,978.20 |

The only issue for decision is whether respondent has erred in treating as ordinary income amounts received by petitioner Charles A. Linehan under certain contracts for the removal of sand and gravel from real property owned by him. Another issue raised by the pleadings was waived by petitioners at the trial.

### FINDINGS OF FACT.

Facts which have been stipulated are so found.
The petitioners are Charles A. Linehan and Marion S. Linehan,

husband and wife, who reside at 10 Myrtle Street, Belmont, Massachusetts. They filed joint Federal income tax returns for the taxable years 1953, 1954, and 1955 with the district director of internal revenue at Boston, Massachusetts.

Petitioner as hereinafter used has reference to Charles A. Linehan who, until his retirement in 1957, was employed for many years as a full-time schoolteacher.

During the taxable years here involved the petitioner owned approximately 17 acres of land, situated in Lexington, Massachusetts, and containing deposits of sand, gravel, and fill dirt. The property had been owned by petitioner's father prior to and at the time of his death in or about 1904 and the deposits were used in a contracting business conducted by him. By will the petitioner's father left the property to the petitioner and others, subject to a life estate therein by petitioner's mother, with a provision that no division was to be made prior to her death. Following the death of the petitioner's father the contracting business he had conducted was terminated and, except for a period of an undisclosed length about 1925, no deposits were removed from the property until 1943. The petitioner's mother died in 1930 and thereupon the property became subject to division between the petitioner and five others. In that year the petitioner purchased the interests in the property of three of the others and about 1940 purchased the interests of the remaining other two. Since then and until the time of the trial herein the petitioner has continued to be the sole owner of the property. After petitioner became the sole owner of the property he was faced with making a decision as to what use or disposition he would make of it, namely, whether to sell it with the deposits contained therein or first take the deposits from the property obtaining as much as possible therefrom and then sell the property.

In 1943 an airport was being constructed at Bedford, Massachusetts, and petitioner's property had been zoned by the town of Lexington for use for industrial purposes. At that time 5 or 6 acres of the property were covered with rows of sand which the petitioner estimated contained about 50,000 cubic yards of sand and which had been built up during prior extractions of deposits from the property. During 1943 the petitioner decided that his future course with respect to the property would be, first, to remove the deposits therefrom down to an elevation of about 125 feet above sea level, which was the elevation of a street contiguous to the property, and then offer the entire acreage as a whole for sale for development for industrial purposes. Thereafter, in 1943, the firm of Baer and Monghola contacted petitioner about obtaining sand from the property, and he entered into an arrangement of an undisclosed character with

the firm under which the firm was to remove the above-mentioned rows of sand and then level off the acreage on which such sand was situated. During its operations on the property, the firm cut a "hole" to an elevation below 125 feet above sea level extending over an area upwards of 2 acres. The petitioner was away, busy with his school-work, and was unable to supervise the firm's operations. However, when he was able to check the property and found the "hole," he terminated the arrangement. Thereafter and until 1949 no deposits were extracted or removed from the property.

In 1949 Highland Sand and Gravel Company, sometimes herein-after referred to as Highland, was "a big concern," having sand and gravel property situated about one-half mile from petitioner's prop-erty and also having on its property equipment and facilities for processing sand and gravel. During 1949 Highland contacted peti-tioner about obtaining all of the sand and gravel in petitioner's prop-erty. The petitioner was unable to leave his schoolwork to supervise operations on his property. Because of that and because of the ex-penses that would be involved for surveying, removal of overburden, and other matters, the petitioner was unable to engage in extracting sand and gravel from the property and in making single sales of small quantities of those materials. Accordingly, he entered into an oral arrangement with Highland pursuant to which the latter, beginning in 1949 and continuing until April 1952, extracted and removed from the petitioner's property sand and gravel overlying an elevation of 125 feet above sea level. Highland did no stockpiling and no process-ing of sand and gravel on the petitioner's property.

At or near the end of Highland's operations on the petitioner's property, Highland extracted sand and gravel which constituted lateral support of a contiguous property not owned by petitioner. This caused sand and gravel to fall from the contiguous property and resulted in considerable controversy between the owner of the contig-uous property and the petitioner and Highland.

The number of cubic yards of sand and gravel extracted and re-moved by Highland from the petitioner's property was determined by quantity surveys of the property made by petitioner's surveyor. Highland paid petitioner 10 cents a cubic yard with respect to the sand and gravel it extracted and removed prior to 1952 and 18 cents per cubic yard with respect to that extracted and removed during 1952.

In 1953 the petitioner received $3,055.86 from Highland on account of sand and gravel which it extracted and removed from his property during 1952. The petitioner paid $568.08 in 1953 for a survey of the property and for the collection of the $3,055.86, leaving net proceeds of $2,487.78 from the property for 1953. The delay in payment until 1953 resulted from the death in 1952 of Highland's president.

From April 1952 until September 1954 no sand or gravel was extracted and removed from the petitioner's property.

At the time Highland ceased its removal of sand and gravel from the property there remained about 4 acres of the property with sand and gravel overlying an elevation of 125 feet above sea level, the removal of which would take away the lateral support of adjacent land. The owner of the adjacent land had about the same acreage of land with sand and gravel similarly situated with respect to the petitioner's 4 acres. In 1954 the owner of the adjacent land and the petitioner agreed to permit the removal of sand and gravel across their joint property line.

In 1954 Wes-Julian Construction Corporation, sometimes hereinafter referred to as Julian, had been engaged with respect to the construction of a nearby airport and was in need of sand and gravel in connection therewith. On May 27, 1954, petitioner and Julian entered into a written contract which, in pertinent part, is as follows:

AGREEMENT made this 27th day of May, 1954, by and between CHARLES A. LINEHAN of Belmont, County of Middlesex, Massachusetts, hereinafter sometimes known as "the first party", and WES-JULIAN CONSTRUCTION CORPORATION, a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and having a usual place of business in Dedham, County of Norfolk, said Massachusetts, hereinafter sometimes known as "the second party":

WHEREAS the Second party has contracted with the government of the United States or an agency thereof to perform certain construction work at the Bedford Airport, and

WHEREAS the first party is the owner of a certain parcel of land in the Town of Lexington, said Middlesex County, referred to in Agreement between the first party and Lexington Sand & Gravel Co., dated March 19, 1954, and recorded with Middlesex South District Deeds, Volume 8239, Page 177, and by the terms of said Agreement has the right to take sand and gravel on certain land of said Lexington Sand & Gravel Co. as shown on plan referred to in said Agreement, and

WHEREAS the second party desires to acquire from the first party the right to remove sand and gravel from a part of the said land of the first party and from said land of said Lexington Sand & Gravel Co. from which the first party has the right to remove sand and gravel pursuant to the terms of said Agreement between the first party and Lexington Sand & Gravel Company dated March 19, 1954, to use in connection with its said contract with the government.

Now, THEREFORE, in consideration of the premises and of the agreements hereinafter contained, it is AGREED as follows:

1. The second party shall have the exclusive right to remove sand and gravel from the said land of said Lexington Sand & Gravel Co. and from said land of the first party along the northeasterly and northwesterly boundary of said land of the first party within an area of one hundred (100) feet each side of the said boundary and between a point on said boundary one hundred seventy-seven and seventy-seven one hundredths (177.77) feet southeast of Westview Street and a point on said boundary one hundred twelve (112) feet southwest

of the northeasterly corner of said land of the first party; provided, however, that no sand or gravel shall be removed below the one hundred twenty-eight (128) foot elevation above sea level or beyond the foot of the slopes on each side of said boundary line as determined by C. Lawrence Bond, Civil Engineer, of Boston, hereinafter sometimes referred to as "said Bond", who shall also indicate the elevations at the foot of the slopes and the line of the foot of the slopes by stakes on the premises and shall also determine by cross sectional method the total quantity of sand and gravel contained in the sand and gravel bank or banks within the bounds of the land hereinbefore described, before any sand or gravel is removed therefrom.

2. The second party shall pay to the first party for any and all sand and gravel removed hereunder a price of twenty cents (20¢) per cubic yard.

3. The second party shall submit on or before the fifteenth day of each month to the first party a sand and gravel quantity accounting record (in cubic yards) of the total number of yards removed during the preceding month.

4. Monthly payments for sand and gravel removed hereunder shall be made by the second party to the first party within ten days after payment by the government to the second party under its said contract with the government and the amounts thereof shall be based upon the monthly engineer's estimate by the United States Army Corps of Engineers of the quantity of sand and gravel so removed during the preceding month.

5. Upon the signing of this Agreement the second party shall make a payment in advance to the first party in the amount of One Thousand Dollars ($1,000) which shall be deducted from the final payment to be made hereunder. In the event that the second party fails to remove sand and gravel to the amount of five thousand (5,000) cubic yards ($1,000 worth) during the term of this Agreement, the first party shall retain said sum as liquidated damages.

6. This Agreement and all rights of the second party hereunder shall terminate two years from the date hereof.

7. Upon the completion of the removal of the sand and gravel the subject matter of this Agreement, a final survey will be made by said Bond, or some other civil engineer to be agreed upon by the parties hereto, and a final computation of the quantity of sand and gravel actually removed shall be made and a final payment by the second party to the first party shall be made in accordance with such final computation and within fifty (50) days of the said completion of the said removal of said sand and gravel, and the second party shall notify the first party of the completion of the removal of said sand and gravel hereunder immediately upon such completion.

8. The charges and expenses of said Bond, or any other civil engineer or engineers agreed upon by the parties hereto, for work performed and services rendered hereunder shall be borne equally by the parties hereto.

9. The second party will hold harmless and indemnify the first party from all claims for damages to persons and all liability made or resulting from operations hereunder or in any way connected therewith or attributable thereto.

10. This Agreement shall be binding on the parties hereto, their heirs, successors and assigns.

In pursuance of the foregoing agreement petitioner received from Julian during the taxable year 1954 the sum of $17,652.20. Petitioner's expenses for survey and inspection were $1,450.25, leaving net proceeds of $16,201.95.

On December 29, 1954, petitioner and Julian enter into another writ-

ten agreement regarding the extraction of sand and gravel from petitioner's property which, in pertinent part, is as follows: [1]

AGREEMENT made this 29th day of December, 1954, by and between CHARLES A. LINEHAN of Belmont, County of Middlesex, Massachusetts, hereinafter sometimes known as "the first party", and WES-JULIAN CONSTRUCTION CORPORATION, a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and having a usual place of business in Dedham, County of Norfolk, said Massachusetts, hereinafter sometimes known as "the second party":

WHEREAS the second party has contracted with the U.S. Army Engineers to perform certain construction work at the Hanscom Air Force Base, Bedford, and

WHEREAS the first party is the owner of a certain parcel of land in the Town of Lexington, said Middlesex County, referred to in an Agreement between the first party and Lexington Sand & Gravel Co., dated March 19, 1954, and recorded with Middlesex South District Deeds, Volume 8239, Page 177, and by virtue of rights acquired thereunder did by Agreement dated May 27, 1954, grant to the second party the right to take sand and gravel to an elevation of one hundred twenty-eight (128) feet above sea level from a portion of said land of said first party, and

WHEREAS the second party desires to acquire from the first party the right to remove sand and gravel from the remainder of said land of said first party in accordance with terms and conditions hereinafter set forth, the said sand and gravel to be used in connection with any and all projects involving the construction and improvement of the said Hanscom Air Force Base, Bedford, Massachusetts, and

WHEREAS there now exists on and within the bounds of said land of the first party a pond, hereinafter referred to as "the large pond" which the first party desires to have the second party furnish the work, labor and equipment required to be used to fill in the said large pond, and

WHEREAS the first party is to contribute filling material to the extent of ten thousand (10,000) cubic yards toward the amount of fill necessary to fill in the large pond and all additional filling material required to fill in said large pond to the one hundred twenty-five (125) foot elevation above sea level is to be furnished and supplied by the second party,

Now, THEREFORE, in consideration of the premises, and of the agreements hereinafter contained, it is AGREED as follows:

1. The second party shall have the exclusive right to remove sand and gravel from the said remainder of said land owned by the first party, provided, however that no sand or gravel shall be removed below the one hundred twenty-five (125) foot elevation above sea level, as determined by C. Lawrence Bond, Civil Engineer, of Boston, who shall also determine by cross sectional method the total quantity of sand and gravel available by measuring the amount of material contained in the sand and gravel bank or banks within the bounds of the said remainder of said land of said first party before the removal of any sand and gravel by the second party under the terms and provisions of this contract, and provided further that the second party shall leave on the premises ten thousand (10,000) cubic yards above the one hundred

---

[1] It is to be observed that the preceding contract of May 27, 1954, between the parties provided that no sand or gravel should be removed below a 128-foot elevation above sea level from the land involved therein whereas the contract of December 29, 1954, provided that no sand or gravel should be removed below a 125-foot elevation above sea level from the remainder of petitioner's land.

twenty-five (125) foot elevation above sea level in the sand and gravel bank on the northwesterly part of the property of the first party subject to said Agreement dated May 27, 1954, which quantity of sand and gravel is reserved for said first party, and further provided that the second party shall level said remainder of said land of said first party (the subject matter of this Agreement) at the one hundred twenty-five (125) foot elevation above sea level.

2. The second party shall fill in the above referred to large pond with suitable filling material acquired either on or off said premises; and in consideration thereof, the first party agrees to accept as payment for the said sand and gravel removed from the said remainder of said land of said first party, or used for filling said large pond (in excess of the said ten thousand (10,000) cubic yards to be contributed by the first party to said filling) the sum of fifteen cents (15¢) per cubic yard.

3. The second party shall submit on or before the fifteenth day of each month to the first party a sand and gravel quantity accounting record (in cubic yards) of the total number of yards removed from the premises, and of the total number of yards originating on the premises and used for filling said large pond, during the preceding month.

4. Monthly payments for sand and gravel removed or used hereunder shall be made by the second party to the first party within ten days after payment by the government to the second party under its said contract with the government and the amounts thereof for sand and gravel removed from the premises shall be based upon the monthly engineer's estimate by the United States Army Corps of Engineers of the quantity of sand and gravel so removed during the preceding month.

5. The second party shall have the right and privilege during the term of this contract to pass and repass over the property owned by the first party in the general area, including the use of any approach roads constructed by the second party leading to and from the above described premises of the first party to the said Airport during the term of this herein contract.

[Here follow paragraphs 6, 7, 8, 9, and 10, which are substantially identical to numbered paragraphs 6, 7, 8, 9, and 10 of the agreement dated May 27, 1954, set forth above.]

In pursuance of the latter agreement petitioner received from Julian during the taxable year 1955 the sum of $15,600. Petitioner's expenses for survey and inspection were $1,269.64, leaving net proceeds of $14,330.36.

Julian removed all the sand and gravel contemplated by the foregoing agreements except a small portion on one side of the property, the removal of which would have taken away the lateral support of an adjacent property not owned by petitioner. Pursuant to the agreement of December 29, 1954, Julian also filled in the "hole" on the property to a 125-foot elevation and leveled the remainder to a like elevation as contemplated by the agreement. After removal of sand and gravel overlying an elevation of 125 feet above sea level the property continued to contain deposits of sand and gravel and was far more valuable than before the deposits were removed to that elevation.

Prior to 1953 the petitioner had recovered his entire basis for the property.

For several years prior to the trial the petitioner attempted to sell the property as a whole and on various occasions entered into negotiations for its sale but without success. However, at some time or times prior to the trial, petitioner sold 2 acres of the property.

In their income tax returns for 1953, 1954, and 1955 the petitioners treated the net receipts from the extraction of sand and gravel from the property by Highland and by Julian, respectively, as receipts from the sale of long-term capital assets and as being long-term capital gains. In determining the deficiencies the respondent determined such receipts were ordinary income and allowed deductions therefrom of 5 per cent of gross receipts as percentage depletion in respect of sand and gravel under sections 23(m) and 114(b)(4)(A)(i) of the Internal Revenue Code of 1939 as to 1953, and under sections 611 and 613(b)(5) of the Internal Revenue Code of 1954 as to 1954 and 1955.

OPINION.

The petitioners take the position that the oral arrangement between the petitioner and Highland and the written agreements between him and Julian effected sales by the petitioner and purchases by those companies at specified prices per cubic yard of sand and gravel extracted and removed from petitioner's property and that the amounts received by petitioner constituted long-term capital gains and were taxable as such. Since the petitioners contend on brief that the petitioner was not in the business of selling sand and gravel and did not hold sand and gravel for sale to customers in the ordinary course of trade or business, we construe their position to be that, by entering into the arrangement with Highland and the agreements with Julian, the petitioner effected outright and completed sales of the sand and gravel in place, involved in the arrangement and the agreements, and that petitioner thereafter owned no interest of any kind whatever in such sand and gravel and not to be that, under the arrangement and the agreements, the petitioner during the years involved made numerous single sales of small quantities of sand and gravel as and when removed from his property.

The petitioners urge that *Robert M. Dann*, 30 T.C. 499, supports their position and should be followed here. In that case the taxpayer in 1950 owned lands which he used in a dairy farming business in which he had been engaged for a number of years. A contractor, who was engaged in the construction of a railroad right-of-way and certain levees in the vicinity of the taxpayer's lands and who required large quantities of fill dirt for the construction, contacted the taxpayer about obtaining such dirt from his farmlands. Thereafter, in 1950, the taxpayer entered into three separate written agreements with the contractor granting the contractor the right to enter upon

three separate tracts, comprising a total of approximately 53 acres of the taxpayer's lands, and remove therefrom the soil from the surface down to the top of the water table and providing for the payment to the taxpayer of certain stated amounts per cubic yard for the soil removed. Although the agreements specified by metes and bounds the surface area involved, the quantity of removable soil was not ascertainable because of variations in the depth of the water table below the surface and due to the rolling topography of the tracts. The agreements provided that the quantities of soil removed from the various tracts would be determined by engineers employed by the State Highway Department and that their determinations should be conclusive on the parties. The agreements contained provisions relating to the condition in which the edges and bottoms of the pits were to be left and also relating to the drainage from the pits. The contractor removed all of the usable soil from the three tracts and after doing so sought to obtain soil from additional lands of the taxpayer to complete the construction. The taxpayer refused and the contractor was forced to obtain its further requirements elsewhere. When the taxpayer entered into the agreements, he was aware that the removal of the soil from the tracts would render them unsuitable for dairy farming purposes. Such removal not only rendered the tracts useless for dairy farming purposes but made it impossible to rehabilitate them. From a consideration of the agreements and the evidence relating thereto, we found that the taxpayer and the contractor by the agreements intended to and did effect completed sales at specified cubic yard prices of all of the usable soil in place on the tracts involved and held that the taxpayer's gains from the sales represented long-term capital gains.

As indicated in the *Dann* case, the basis for our holding there was that by the agreements in question the parties had effected completed sales of the soil in place on the respective tracts.

As was said by the Supreme Court in *Helvering* v. *Hammel*, 311 U.S. 504, the term "sale" may have many meanings, depending on the context. In *Betty Rogers*, 37 B.T.A. 897, affd. 103 F. 2d 790, certiorari denied 308 U.S. 580, the question involved was whether there had been a sale of a capital asset with a resulting capital loss. In holding in the affirmative, we concluded that in construing the term "sale" it should be given its ordinary meaning and there adopted and applied the following meaning given the term by the Supreme Court in *Iowa* v. *McFarland*, 110 U.S. 471, 478: "A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent." Similarly, in *Ralph A. Boatman*, 32 T.C. 1188, involving the question of whether a certain sum constituted capital gain or ordinary income, we adopted and applied the fore-

going meaning set out in *Iowa* v. *McFarland*. We find nothing in the instant case which requires that the term should be given a different meaning here.

The petitioner's property consisted of approximately 17 acres. In 1943 Baer and Monghola cut a "hole" in the property by removing sand and gravel to an elevation below 125 feet above sea level from upwards of 2 acres of the property. That left approximately 15 acres with deposits of sand and gravel overlying an elevation of 125 feet above sea level. Beginning in 1949 and continuing until April 1952, Highland removed from the property sand and gravel overlying an elevation of 125 feet above sea level. When Highland's removal of sand and gravel ceased about April 1952, there remained about 4 acres from which sand and gravel could not be removed because of endangering lateral support to contiguous property. This indicates that Highland's operations extended over about 11 acres of property. By an agreement entered into by the petitioner and the owner of the contiguous property in 1954, the sand and gravel on the petitioner's 4 acres became available for removal. The agreement of May 27, 1954, between petitioner and Julian related to the removal of sand and gravel from the petitioner's 4 acres overlying an elevation of 128 feet above sea level, and from approximately the same acreage of contiguous property. The agreement of December 29, 1954, between petitioner and Julian related to the removal down to an elevation of 125 feet above sea level of sand and gravel from the "remainder" of petitioner's property, that is, the property of the petitioner other than the 4 acres. The agreement of December 29, 1954, also provided for filling in the approximately 2-acre "hole" to an elevation of 125 feet above sea level and leveling off the other approximately 11 acres to a like elevation.

The petitioner testified in effect that the arrangement he made with Highland in 1949 provided that Highland would remove from his property all sand and gravel thereon overlying an elevation of 125 feet above sea level that was available without endangering lateral support to contiguous property. He further testified that Highland discontinued removal because it had removed all the sand and gravel overlying the 125-foot elevation which was available without endangering lateral support to contiguous property. Petitioner made no attempt to reconcile the foregoing testimony with the fact that the same approximately 11 acres from which Highland had removed sand and gravel were the same acres involved in his agreement of December 29, 1954, with Julian to remove the sand and gravel thereon to the same 125-foot elevation above sea level and that Julian in 1955 paid him $15,600 with respect to sand and gravel which it removed from the property in that year under that agreement. At the rate of 15

cents per cubic yard provided in the agreement Julian obviously in 1955 removed 104,000 cubic yards from the acreage in question. Nor do petitioners attempt to explain how if petitioner by his arrangement with Highland in 1949 had made a completed sale to Highland of the 104,000 cubic yards of sand and gravel in place, he could by the agreement of December 29, 1954, with Julian make a completed sale of the same sand and gravel in place to Julian. Nor do petitioners offer any explanation as to why, if the petitioner in 1949 had made a completed sale to Highland of the sand and gravel in place, he received only 10 cents per cubic yard of sand and gravel with respect to that removed during the years 1949, 1950, and 1951, and 18 cents, or upwards of twice as much, with respect to that removed in 1952. The *Dann* case did not present such a contradictory and irreconcilable situation as the foregoing. In view of the foregoing and meagerness of the evidence relating to the arrangement with Highland, we cannot find that by that arrangement petitioner and Highland intended to or did effect a completed sale of any sand and gravel in place.

The agreement of May 27, 1954, between petitioner and Julian related to the removal of sand and gravel from the heretofore mentioned 4 acres of petitioner's property and from a contiguous property of approximately the same acreage owned by another. The agreement does not contain any language which implies a sale by petitioner or a purchase by Julian of any sand or gravel on either of the properties. The agreement recites that Julian "desires to acquire from" the petitioner "the right to remove sand and gravel from" the properties, and that Julian "shall have the exclusive right to remove sand and gravel from" them overlying an elevation of 128 feet above sea level, and that the agreement and all rights of Julian thereunder "shall terminate two years from the date hereof." The agreement provides for the determination by a named civil engineer of "the total quantity of sand and gravel contained in the" properties above the 128-foot elevation "before any sand or gravel is removed therefrom" and provides that, "Upon the completion of the removal of the sand and gravel" comprising the subject matter of the agreement, "a final computation of the quantity of sand and gravel actually removed shall be made" by the same civil engineer. Despite the foregoing provisions respecting determinations as to quantities of sand and gravel, it is to be observed that the agreement does not recite, nor is there any explanation of its failure to recite, any specific or approximate quantity of sand and gravel as comprising the subject matter of the agreement or any specific or approximate quantity to be removed from either petitioner's acreage or the contiguous acreage or from both. The agreements in the *Dann* case failed to contain such a provision, but the failure was explained by a showing that the

quantities involved were not determinable prior to extraction because of an inability to determine the variations in the depth of the water table below the surface. Nor does the agreement of May 27, 1954, contain any provision purporting to be a conveyance or transfer to Julian of all of the petitioner's right, title, or interest in the sand and gravel in the portion of petitioner's property covered by the agreement or in the contiguous property also covered by the agreement. Nor is there any provision purporting to presently obligate Julian to remove or pay for the sand and gravel comprising the subject matter of the agreement.

The agreement of May 27, 1954, provided in numbered paragraph 5 as follows:

Upon the signing of this Agreement the second party shall make a payment in advance to the first party in the amount of One Thousand Dollars ($1,000) which shall be deducted from the final payment to be made hereunder. In the event that the second party fails to remove sand and gravel to the amount of five thousand (5,000) cubic yards ($1,000 worth) during the term of this Agreement, the first party shall retain said sum as liquidated damages.

The agreements in the *Dann* case did not contain a provision like or similar to the foregoing.

Although the evidence shows that the petitioner had the right to take sand and gravel from the contiguous land involved in the agreement of May 27, 1954, it shows nothing as to the nature or character of that right or the terms of the agreement under which the petitioner acquired the right. Whatever may have been the nature of the petitioner's right, we are of the opinion that the above-quoted provision when considered in connection with the remainder of the agreement is inconsistent with a view that the agreement effected a completed sale to Julian of the sand and gravel in place and a resulting present obligation on the part of Julian to make payment therefor. By making payment of the $1,000 mentioned in the above-quoted provision, Julian forestalled the disposition of the sand and gravel to anyone else during the 2-year period of the agreement without in anywise being obligated to remove, or pay for, the sand and gravel in question or any portion thereof.

There is also a provision in the agreement of December 29, 1954, which we think is not consistent with a view that the agreement of May 27, 1954, effected a completed sale of the sand and gravel in place comprising the subject matter of that agreement. To the extent we are able to determine from the record, all the sand and gravel on the petitioner's property comprising the subject matter of the agreement of May 27, 1954, had been removed by December 29, 1954, except 10,000 cubic yards "on the northwesterly part of the property." Respecting such sand and gravel, the agreement of December 29, 1954, in numbered paragraph 1 provides:

That the second party [Julian] shall leave on the premises ten thousand (10,000) cubic yards above the one hundred twenty-five (125) foot elevation above sea level in the sand and gravel bank on the northwesterly part of the property of the first party [petitioner] subject to said Agreement dated May 27, 1954, which quantity of sand and gravel is reserved for said first party * * *

If by the agreement of May 27, 1954, there had been a completed sale of the sand and gravel comprising the subject matter of that agreement, we fail to see how the petitioner thereafter could reserve a portion thereof as indicated by the foregoing provision. The agreements involved in the *Dann* case did not contain a provision like or similar to that here considered.

From our consideration of the agreement of May 27, 1954, and the evidence relating thereto, we are unable to find that it was intended to or did effect a completed sale of the sand and gravel in place comprising the subject matter of the agreement.

Aside from the reservation of sand and gravel discussed above, the agreement of December 29, 1954, related to the "remainder" of petitioner's property, that is, the portion of the property other than the 4 acres involved in the agreement of May 27, 1954, and contains provisions respecting work, labor, and material to be furnished by Julian in filling the "hole" cut by Baer and Monghola in the property, the extraction and removal by Julian of sand and gravel from the property, and the leveling of such remainder of the property by Julian to an elevation of 125 feet above sea level.

The agreement does not contain any language importing a sale by petitioner or a purchase by Julian of any sand or gravel. The agreement recites that Julian "desires to acquire from" the petitioner "the right to remove sand and gravel from" the property of the petitioner and that Julian "shall have the exclusive right to remove sand and gravel from the" property overlying an elevation of 125 feet above sea level and that the agreement and all rights of Julian thereunder "shall terminate two years from the date hereof." Although the agreement contained provision for the determination by a named civil engineer of the quantity of sand and gravel in the sand and gravel bank or banks on the property before the removal of any of those materials under the agreement and further provided that, upon completion of removal of the sand and gravel comprising the subject matter of the agreement, a final computation by the named civil engineer should be made of the actual quantity of sand and gravel removed and used as therein provided, the agreement does not recite nor is there any explanation of its failure to recite any specific or approximate quantity as constituting the subject matter of the agreement. The failure of the agreements in the *Dann* case to contain such a provision was satisfactorily explained. Nor does the agreement contain any provision purporting to be a conveyance or transfer to

Julian of all petitioner's right, title, or interest in the sand and gravel involved therein. Nor is there any provision purporting to presently obligate Julian to remove or pay for the sand and gravel comprising the subject matter of the agreement. Although the agreement did not contain any provision similar to that contained in numbered paragraph 5 of the agreement of May 27, 1954, we are unable to find that it effected or was intended to effect a completed sale of the sand and gravel in place comprising the subject matter of the agreement.

After the sand and gravel had been removed from petitioner's property to an elevation of 128 feet above sea level in the case of approximately 4 acres thereof and removed and leveled to an elevation of 125 feet above sea level in the case of the remaining approximately 13 acres, it continued to contain available sand and gravel and was far more valuable than before the sand and gravel overlying the above elevations had been removed. All of the available soil was removed from the lands involved in the *Dann* case and such removal not only rendered them useless for dairy farming, the purpose for which they theretofore had been used, but rendered them unrehabilitatable.

The petitioner also relies on *Griffith* v. *United States*, 180 F. Supp. 454 (D. Wyo.), which relied in part on the *Dann* case. In the *Griffith* case the taxpayer owned certain tracts of land which were used for grazing purposes. The land was known to contain bentonite but the quantity thereof was not ascertainable prior to extraction. The taxpayer at different times entered into long-term, 15- and 20-year, written agreements with two different parties, which in form were leases and which gave the parties the exclusive right to mine and remove from certain of the tracts all of the merchantable bentonite contained therein, with stated minimum and maximum payments to be made semiannually or annually to the taxpayer throughout the life of the agreements. By reason of such required payments the taxpayer would benefit even though no bentonite whatever was mined and removed from the land. All of the bentonite in the tracts covered by three of the agreements has been removed and it is anticipated that removal of all of the bentonite in the tract covered by the remaining agreement will be completed prior to the expiration of that agreement in 1966. Removal of the bentonite rendered the land useless and worthless. There the court concluded that the agreements constituted sales of bentonite in place and that the taxpayer was entitled to report the receipts as gains from the sale of capital assets.

The factual situation in the *Griffith* case is distinguishable from that in the instant case. Here the quantities of sand and gravel involved were determinable at the time the arrangement and agreements were entered into but no showing is made of any effort to

determine them prior to making the arrangement and agreements. Here no payments, semiannually, annually, or otherwise, were required if no sand or gravel was removed except the $1,000 involved in the agreement of May 27, 1954. As to the sand and gravel involved in that agreement, the petitioner reserved a portion thereof by the agreement of December 29, 1954. Here the extraction and removal of the sand and gravel rendered the petitioner's property far more valuable than theretofore and did not render it useless and worthless as in the *Griffith* case.

The case of *Sanders* v. *United States*, —— F. Supp. —— (E.D. S.C., Aug. 8, 1960), also has been brought to our attention. In that case the court was called upon to construe agreements which had been entered into by the taxpayer and a sand and gravel company under which the company entered upon the land of the taxpayer and for a consideration removed certain sand and gravel deposits, and to determine whether the agreements should be treated as a sale of sand and gravel in place or as a lease of the land with exploitation rights. The report of the case does not show the terms of the agreements nor does it contain any statement of the facts involved except the following: "Here the parties have stipulated that in actual practice payments were based on weights determined immediately upon extraction and did not depend at all upon the resale of the deposits." From that the court concluded that the agreements constituted a sale of the sand and gravel in place and that the amounts received by the taxpayer under the agreements should be treated as capital gain.

With no more facts than are shown in the *Sanders* case, we cannot find that the court's holding therein has applicability here. Not every agreement wherein a landowner gives another the right to enter upon his land and for a consideration remove sand and gravel therefrom constitutes a sale of sand and gravel in place and renders the amounts received by the landowner taxable as capital gain.

In *Battjes* v. *United States*, 172 F. 2d 1, the taxpayer, operating as Battle Creek Gravel Company, owned a tract of land containing gravel deposits and was engaged in extracting gravel therefrom, processing (washing and grading) the gravel, and selling it. Sales of processed gravel and sales of small quantities of unprocessed or raw gravel were recorded on the books kept for the processed gravel business. But transactions involving large quantities of raw gravel were not so recorded. Harry Pickitt obtained a subcontract to provide the materials necessary to build runways for an airfield near the taxpayer's property. Pickitt entered into an agreement with the taxpayer under which he was to obtain raw gravel needed for the job. The taxpayer and he agreed upon a place on the taxpayer's

property which was distant from the taxpayer's gravel plant from which the gravel in its natural shape (raw gravel) would be taken. Pickitt extracted gravel under the agreement and removed it with his own trucks with no record being kept by the taxpayer and no invoices being rendered by him but with Pickitt making payments based on his own records and as he was paid for the gravel. Pickitt began removing gravel in 1941 and continued to do so into 1942, making payments of a total of more than $10,700 in 1941 for part of the gravel removed in that year and making a payment in excess of $5,000 in 1942 for the remainder. While the above-mentioned agreement was in effect, Pickitt purchased from taxpayer some processed gravel which he needed to mix with the raw gravel to meet required specifications. These transactions were handled and recorded on the books kept for the processed gravel business as were other sales of processed gravel. The taxpayer contended that his transaction with Pickitt respecting the raw gravel constituted a sale of the raw gravel in place and consequently the sale of a capital asset. In holding that the raw gravel extracted and removed by Pickitt was property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business and not a capital asset, the court said:

> Under the facts of this case, we do not construe the sale of raw gravel to Pickitt as a sale of gravel in place. The raw gravel was sold from the same tract of land from which the processed gravel was taken and washed and graded. It was not sold in bulk but was paid for by the cubic yard as taken. Nor was it a sale of all the gravel in place under a described surface area which would remain in place with title in the purchaser. Rather it was the sale of only a part of the gravel in that locality looking to its extraction from the realty. Although the principal business of the Company was the sale of processed gravel, yet there was evidence that raw gravel such as was sold to Pickitt was also sold to other contractors. * * *

In the *Dann* case we quoted with approval the following statement made by the Court of Appeals for the Fifth Circuit in *Crowell Land & Min. Corp.* v. *Commissioner*, 242 F. 2d 864, reversing 25 T.C. 223: "Looking to the actual circumstances as well as the language of the contract of sale, there is no occasion or basis for resorting to legal niceties of interpretation to defeat the basic purpose and effect of the transaction."

The *Crowell* case involved an instrument which in form was a sale and conveyance by Crowell of all sand and gravel underlying certain described land for a price to be determined as fixed in the instrument and to be paid in cash in installments. The primary question was whether the instrument was what it purported to be or was a lease. The Court of Appeals concluded that it was a sale.

Since we do not have involved here any instrument which purports to be a sale and conveyance of sand and gravel by petitioner, we do

not think the above-quoted statement has application here, but if it does, we do not think it relieves one who claims that an instrument effected a sale, of his burden of establishing that it effected "a transfer of property for a fixed price in money or its equivalent." In our opinion the petitioner has not discharged that burden here.

In view of the theory of *Burnet* v. *Harmel*, 287 U.S. 103, and *Palmer* v. *Bender*, 287 U.S. 551, and in view of the failure of the petitioners to establish that the petitioner's arrangement with Highland and his agreements with Julian were intended to and did effect sales of sand and gravel in place, we are unable to hold that the respondent's action was erroneous.

Reviewed by the Court.

*Decision will be entered for the respondent.*

OPPER, *J.*, dissents.

───────

MURDOCK, *J.*, dissenting: The Tax Court originally took the view in cases like this that gains on sale of sand and gravel were ordinary rather than capital gains, but the Fifth, Ninth, and Second Circuits reversed and held for capital gains. *Crowell Land & Min. Corp.* v. *Commissioner*, 242 F. 2d 864; *Gowans* v. *Commissioner*, 246 F. 2d 448; *Barker* v. *Commissioner*, 250 F. 2d 195. These decisions have been followed in *Griffith* v. *United States*, 180 F. Supp. 454; *Bel* v. *United States*, 160 F. Supp. 360; *Sanders* v. *United States*, —— F. Supp. —— (Aug. 8, 1960); *Witte* v. *United States*, —— F. Supp. —— (Oct. 12, 1960). The Court of Appeals for the Fifth Circuit in the *Crowell* case quoted in full, with approval, my dissent in *Crowell Land & Mineral Corporation*, 25 T.C. 223. Subsequently, this Court decided to follow the Circuit Courts on this problem. See *Robert M. Dann*, 30 T.C. 499, where the *Crowell* reversal is cited with approval. The majority opinion starts this all over again by going back to our original position which, I think, is a great mistake.

The present case is not distinguishable from the *Dann* case or from other of the cases cited above. The petitioner sold the material for a fixed price per unit removed. Nothing was to vary that price or the vendee's obligation to pay it. Petitioner was in no way to benefit from the removal of the material except by the payment of a fixed price per unit. Particularly, he was not to share in any profit or income derived by the vendee from the removal of the material. It should be held on these facts and on the authority of the prior opinions that the gain here involved should be taxed at capital gains rates.

FORRESTER, *J.*, agrees with this dissent.