Claude C. Wood Co. v. Commissioner.
Claude C. Wood Co. v. Commissioner
Docket No. 87592.
United States Tax Court
T.C. Memo 1962-26; 1962 Tax Ct. Memo LEXIS 281; 21 T.C.M. (CCH) 117; T.C.M. (RIA) 62026; February 9, 1962
Robert H. Mullen, Esq., and Frank T. Andrews, CPA, 593 Market St., San Francisco, Calif., for the petitioner. James Booher, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Of a deficiency determined in petitioner's 1958 income tax of $9,347.35, $8,760.00 is in controversy. The sole issue is whether petitioner is entitled to deduct percentage depletion on rock, sand, and gravel which it removed from property that had already been dredge-mined for gold. Certain concessions have been made by petitioner. Findings of Fact Petitioner, a California corporation, filed its 1958 Federal income tax return with the district director of internal revenue at San Francisco, California. Among *282 other things, petitioner operates a rock, sand, and gravel business. During 1958, petitioner operated this business from the Featherston, Putnam Ranch, and Wright properties. Featherston contained approximately 160 acres located west of the Clements Ione Bridge, approximately 1/2 mile north of Clements, San Joaquin County, California. Here petitioner operated under a January 23, 1953 agreement. This agreement reads in part as follows: WHEREAS, as a result of the dredging operations by First Party, sand and gravel have been made available, which sand and gravel Second Party desires to purchase to the extent herein described. NOW, THEREFORE, in consideration of the premises, it is agreed between the parties hereto as follows: First Party hereby grants to Second Party the first and exclusive right, for a term of 15 years from the date hereof, to take, remove and market, all sand and aggregates resulting from the dredging operations of First Party on the above described real property, upon the following terms and conditions: Putnam Ranch contained approximately 100 acres located approximately 2 miles east and 1 mile north of Clements, San Joaquin County, California. Here petitioner *283 operated originally under a March 25, 1942 agreement, and during the year 1958 petitioner operated under a January 31, 1951 agreement. The first of these agreements reads in part as follows: This Agreement made and entered into this 25th day of March, 1942, Between L. E. Putnam and Edna Putnam Albertson, parties of the first part, AND Claude C. Wood, Lodi, California, party of the second part whereby IN AND FOR THE CONSIDERATION OF ONE HUNDRED ($100.00) DOLLARS, Cash in hand, the parties of the first part agree to give to the party of the second part an Exclusive option to purchase sand, gravel and rock from the Dredger operations on the property known as the "Putnam Ranch," situated approximately two miles east and one mile North of Clements. IT IS ALSO AGREED, that the parties of the first part will accept and the party of the second part will pay, as a royalty, the sum of Two and one-half ($0.025) Cents per cubic yard for all such materials taken from the above mentioned deposits on the Putnam Ranch. The second of these agreements reads in part as follows: WHEREAS, the parties hereto have heretofore on the 25th day of March, 1942, entered into a certain agreement which gave *284 Second Party the right to excavate and remove sand, gravel and rock from the dredger operations heretofore conducted on property owned by First Parties, and which property is known as the "Putnam Ranch" located approximately two miles east and one mile north of Clements, San Joaquin County, California; and WHEREAS, the parties hereto are desirous of continuing said agreement and making certain modifications thereof; NOW, THEREFORE, for value received, the parties hereto do hereby agree as follows: Wright contained approximately 50 acres located 1 mile north and 1 mile east of Clements, San Joaquin County, California. Here petitioner operated under a November 2, 1950 agreement. This agreement reads in part as follows: WHEREAS, THE VENDORS now own approximately fifty (50) acres of land (hereinafter more particularly set forth) in the County of San Joaquin, State of California, on which land, in years past, mining operations have been conducted, and WHEREAS, as a result of said mining operations, there is now present on the surface of this land a quantity of rock, gravel, sand and dredger tailings, and WHEREAS, THE PURCHASER is engaged in commercial operations which necessitate *285 the acquisition and use of rock, gravel, sand and dredger tailings, NOW, THEREFORE, THE VENDORS and THE PURCHASER make and enter into this agreement of sale of the said rock, gravel, sand and dredger tailings, subject to the following terms and conditions: On Featherston and Putnam Ranch, petitioner paid for rock, sand, and gravel removed on a per-ton or cubic-yard royalty basis, subject to certain required minimum payments. On Wright, petitioner paid $9,375 in advance for rock, sand, and gravel removed. The material removed consisted of aggregates - sand, gravel, and rock varying in size up to 10- to 12-inch cobbles. Cobbles are round rocks exceeding 4 inches in size. Gold Hill Dredging Company had dredged each property for gold before petitioner began its operations: Property
Period of Gold Hill's Operations
Featherston
Apr. 12, 1949 to July 17, 1951
Putnam Ranch
Oct. 22, 1940 to Aug. 14, 1942
Wright
May 30, 1944 to Apr. 16, 1946
The Putnam, Wright, and Featherston properties had never been mined for aggregates by Gold Hill Dredging Company or any prior owner, and no aggregates were removed from these properties until the operations were commenced by *286 petitioner. Before dredging, various crops were raised on the Featherston property. These were rotated by running cattle and hogs. The Putnam Ranch had the same general use as the Featherston property. Cattle were grazed on the Wright property. Sand, gravel, and cobbles then existed beneath the topsoil found on Featherston, Putnam Ranch, and Wright. When in place as alluvium deposits, sand and fine gravel filled the voids between the cobbles. Since being dredged, neither Featherston, Putnam Ranch, nor Wright have been used for agriculture. Gold Hill's dredging turned the land upside down. It buried the topsoil on the bottom, leaving the gravel and cobbles on the surface. This dredging separated the sand from the gravel and cobbles, creating piles composed of sand on the bottom, with the gravel and cobbles on the top. This dredging swelled the sand, gravel, and cobbles. After dredging, the voids between the cobbles (previously filled with sand and fine gravel) are not refilled. Gold Hill's dredging procedure was as follows: Surveying. First, Gold Hill drilled the land to determine its gold content. It surveyed the depth of soil, topsoil, depth of gravel, and the distance to *287 bedrock. To measure gold content, it is necessary to determine gravel content. Securing dredging rights and equipment. Next, Gold Hill leased, purchased, or acquired the right to go through these properties. Then Gold Hill selected a location, dug a pit large enough for the dredge, built the dredge in the pit, flooded the pit, and floated the dredge. This dredge's nomenclature and specifications were as follows: Name and Description
Specifications
Bucket line or digging ladder; an arm or ladder at the dredge's
76 buckets
front, containing moving buckets, used for digging gold bearing
10 cu. ft. cap. each
material.
75 ft. in length
Stacking ladder; an arm at the dredge's stern, housing a moving
125/150 ft. in length
belt, used for discharging and stacking gravel and cobbles.
42-inch moving belt
Sluices; short troughs at the dredge's stern, used to discharge sand.
Spud; a square iron structure, projecting from the dredge's
60 ft. long
bottom, used to anchor the dredge.
65 tons in weight
Barge; the water-tight lower portion of the dredge's body, used
150 ft. long
to float and house the dredging machinery.
55 ft. wide
10 ft. deep
Trammel; a rotating tubular perforated screen, containing a spray
60 ft. long
pipe with high-pressure nozzles, set in the dredge, its longitudinal
10 ft. in diameter
axis inclined from horizontal, with the lower edge nearest the
dredge's stern.
*288 Daily, this dredge could process 8,000 cubic yards (in excess of 8,000 tons) of goldbearing material. Stripping and spading. Before digging, Gold Hill removed surface vegetation from in front of the dredge. The bucket line or digging ladder dug the gold-bearing material, then passed it to a hopper. From there it went to the trammel. Scrubbing, screening, or sifting. Inside the trammel, the gold-bearing material became subject to tumbling and washing over a screen. As the trammel revolved, the goldbearing material did not travel the full circle; instead, it went part way up, then back to the bottom. The washing action occurred on the trammel's bottom, where water from high-pressure nozzles, located in the spray pipe, washed the gold-bearing material there present. As this washing action occurred, gold and sand sifted through the perforations in the screen. The trammel contained no machinery for crushing the gold-bearing material, nor did the trammel's action add chemicals to this material, except for scrubbing water. Segregating. As to the fine sand and gold passing through the perforated screen, quicksilver caught the gold. The sand then discharged from the dredge through *289 the sluices. The material that did not pass through the perforated screen (gravel and cobbles) traveled the length of the trammel, discharged from the trammel's stern on to the stacker conveyer belt, traveled the length of the stacker arm, then discharged over the end of the stacker arm. The sand discharged first, nearer the dredge, to make a foundation for the spud to drop in, and thus anchor the dredge. Stacking. The dredge moved or stepped ahead, as it dug gold-bearing material from in front of the dredge, processed this material, then deposited the remainder at the stern of the dredge. Thus gravel and cobbles discharged from the stacking arm fell on previously discharged sand. This created piles composed of gravel and cobbles on the top with the sand on the bottom. The sand, gravel, and cobbles, deposited behind the dredge, swelled from their original position. This swell averaged 35 to 40 percent. Thus if the dredge had dug a hole 100 feet deep, the pile behind the dredge would be 40 feet high. On Featherston, Putnam Ranch, and Wright, Gold Hill dredged to the following depths: Featherston
38 to 40 feet
Putnam Ranch
30 to 32 feet
Wright
30 to 32 feet
*290 The most economical way of handling the placer mining of Featherston, Putnam Ranch, and Wright for gold was by the use of a dredge. The deposits remaining after a gold dredge has been through a property are customarily called tailings piles. Petitioner, in its operations, digs the rock, sand, and gravel from Featherston, Putnam Ranch, and Wright with draglines. Petitioner then loads this material into hauling equipment, hauls it to the plant, and dumps it into hoppers. At the plant, the material moves on conveyer belts, being subjected to washing, sifting, crushing, screening, and sorting. Petitioner produces approximately 15 kinds of rock and sand products (i.e., crusher-run road rock for highway construction, concrete aggregates, rock chip screenings for State highways, septic drain rock for underground construction, cobbles for levy embankment work, riprap, concrete sand, sand for bricklayers, plaster sand, sand for tomato seed beds, and muck sand). Petitioner's processing operations differ for dredged and natural materials. With natural materials the sand comes mixed with the rock, but with dredged materials the sand and rock have been separated. Petitioner's plant requires *291 proportional amounts of sand and rock. If Featherston, Putnam Ranch, and Wright had not been dredged for gold, petitioner would have surveyed and drilled the land (as Gold Hill did), removed the surface vegetation, then removed and stacked the topsoil. Petitioner did not perform these operations on Featherston, Putnam Ranch, and Wright. The aggregates taken from the Putnam, Wright and Featherston properties in the year in question were natural deposits that were mined by petitioner. Respondent determined the deficiency herein by disallowing the amount of $17,975.69 as a depletion deduction claimed in connection with the removal of the aggregates. He has not questioned the fact that petitioner has an economic interest in the properties involved. Opinion Although respondent suggests certain slight differences in the facts, we find this case indistinguishable in principle from Pacific Cement & Aggregates, Inc., 31 T.C. 136 (1958), acq. 1959-1 C.B. 5 withdrawn; nonacq. 1959-2 C.B. 8. We there said (pp. 139, 140, 141): Both section 23(m) of the Internal Revenue Code of 1939 * * * and section 611(a) of the Internal Revenue Code *292 of 1954 * * * provide that in computing net income "[in] the case of mines, oil and gas wells, other natural deposits, and timber" there shall be allowed as a deduction a reasonable allowance for depletion according to the peculiar conditions in each case. * * * The respondent contends that because the Fair Oaks property had previously been dredge mined for gold by Natomas Company prior to the granting of any lease to petitioner and in the dredge mining operation the aggregates (rock, sand, and gravel) had been disturbed, that is, picked up and then dumped back on the land after the gold, if any, had been extracted, the aggregates thereby lost their status as "natural deposits" and acquired the status of dumps or tailings, and were no longer minerals "in place" [1] so as to qualify for a percentage depletion allowance. * * * [Footnote 1 reads: "* * * Regulations 118 provides that the deduction for depletion * * * shall be allowed to the owner of an economic interest in "mineral deposits" which in the regulations are defined as "minerals in place." The regulations also provide that '[the] term "minerals" includes * * * crushed stone * * * gravel * * * sand.'"] * * * We think *293 there might be some reason for the respondent's contention if the property was being reworked for gold but since the property had never been worked for aggregates, it does not seem reasonable to say that such aggregates were in the nature of "mineral dumps artificially deposited from the residue." * * * The aggregates on the Fair Oaks property cover an extended area * * * and are the identical aggregates which were placed in the area by nature, the only difference being that petitioner's predecessor in interest operated by dredge on the deposit as it existed, picking up the sand and gravel, extracting the gold therefrom, and dumping the sand and gravel, minus the gold, in substantially the same place where it had picked it up. There has been no prior mining of the Fair Oaks property for the purpose of extracting aggregates and there has been no change in the size or form of the aggregates. * * * Petitioner leased the Fair Oaks property and worked the identical deposit for aggregates for the first time and in the place where the sand and gravel had been originally laid down by nature. The fact that, in extracting the gold, the sand and gravel had been stirred up does not warrant respondent's *294 taking the position that petitioner was not working a natural deposit in place or that petitioner did not have an economic interest in the very property from which the deposit was being extracted. * * *
The variations in the present facts are insignificant and inconsequential. The issue, as stated by respondent, is: "If the rock, sand, and gravel located on these properties qualify as a natural deposit or mineral-in-place, then petitioner is entitled to a deduction for depletion." [1] His contention that they do not is summed up in such statements as: The term "natural deposits" corresponds to the term "minerals in place" * * *. Minerals in place denote minerals in their natural location - unmoved by artificial means. * * * Petitioner's business did consume man-made deposits of rock, sand, and gravel. We consider this issue to be the one which was decided adversely to respondent in Pacific Cement & Aggregates, Inc., supra. To take account of uncontested *295 adjustments, Decision will be entered under Rule 50. Footnotes
1. There is no issue, for example, as to the existence of an economic interest in the mineral-in-place. Cf., e.g., Linehan v. Commissioner, - F. 2d - (C.A. 1, 1961), reversing 35 T.C. 533↩ (1960).