Joseph Romano and Mary Romano, et al. [1] v. Commissioner. Romano v. Commissioner
Docket Nos. 1263-65 - 1267-65, and 1269-65.
United States Tax Court
T.C. Memo 1967-71; 1967 Tax Ct. Memo LEXIS 188; 26 T.C.M. (CCH) 368; T.C.M. (RIA) 67071; April 7, 1967
*188 Held, that profits realized by a partnership under contractual arrangements with other parties, which gave such parties the right to excavate and remove indefinite quantities of sand, gravel and related materials from the former's property in consideration of agreed per cubic yard payments on amounts of material actually removed - are taxable as ordinary income rather than as capital gains. Samuel L. Green, 35 T.C. 1065, followed. Woolvin Patten and Leon C. Misterek, 1140 Washington Bldg., 1425 Fourth Ave., Seattle, Wash., for the petitioners. Richard Daly, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: These proceedings involve deficiencies in income tax determined by the Commissioner as follows: Dkt.
Calendar
No.
Petitioners
Year
Deficiency
1263-65
Joseph Romano and
Mary Romano
1959
$3,014.96
1960
2,218.33
1961
4,408.48
1264-65
Kenneth J. Romano
and June S. Ro-
mano
1961
486.14
1265-65
Louis Romano and
Eleanor Romano
1959
2,573.14
1960
2,888.44
1961
3,802.07
1266-65
Robert L. Romano
and Jean Romano
1959
814.53
1960
1,022.25
1961
1,600.31
1267-65
Philip M. Kaufer and
Beverly Kaufer
1959
433.47
1960
433.59
1961
646.60
1269-65
Allan Pomeroy and
Loretta Pomeroy
1959
9,069.35
1960
10,895.10
1961
7,332.47
*189 The cases were consolidated for trial. The sole issue for decision is: Where a partnership composed of certain of the petitioners entered into contractual arrangements with other persons, under which the latter became entitled to excavate and remove indefinite amounts of sand and gravel from the partnership's property, during fixed periods of time and in consideration of specified prices per cubic yard - should the profits which the partnership realized under such arrangements be treated for income-tax purposes as long-term capital gains or as ordinary income? All other issues raised by the pleadings have been settled; and effect will be given to such settlements in the computations to be made herein under Rule 50. Findings of Fact Some of the facts have been stipulated. The stipulations of fact and all exhibits therein identified are incorporated herein by reference. Petitioners Joseph Romano and Louis Romano are brothers, who for many years prior to those here involved had actively engaged in various construction projects near Seattle, Washington, including the building of roads, bridges and dams. Petitioners Kenneth J. Romano, Robert L. Romano and Beverly (Romano) Kaufer *190 are children of Joseph. And petitioner Allan Pomeroy is a Seattle lawyer. All these petitioners together with their respective spouses above-named filed joint income tax returns for their taxable years involved, with the district director of internal revenue at Tacoma, Washington. At the time of filing their petitions in this proceeding, all were residents of Seattle except Kenneth J. Romano and his wife, who were residents of Fullerton, California. During the year 1945, petitioners Joseph and Louis Romano, together with a brother called Nick Romano who is not a party to this proceeding, and also together with petitioner Allen Pomeroy, formed a partnership named "Midway Sand and Gravel Company" (sometimes also known as "J. Romano and Associates") to engage in the business of excavating and selling sand and gravel, and also of handling various construction projects. Initially the four organizers had equal interests in the partnership; but some time prior to the taxable years here involved, Joseph's three above-mentioned children acquired an aggregate one-fifth interest, and Nick Romano withdrew and transferred his interest to the other three initial partners. The partnership, shortly *191 after its formation, acquired approximately 50 to 60 acres of sand and gravel-bearing land (sometimes called the "pit area") located between Seattle and Tacoma, Washington; and subsequently, it acquired other contiguous tracts. After acquiring the pit area, it installed various sand and gravel-handling equipment thereon; and began the business of extracting, washing, and selling sand and gravel to customers. In 1947 the partnership undertook certain construction work in Canada; and in connection therewith, Joseph and Louis Romano, who were the active operators of the firm's business, departed for Canada to handle the new projects. Thereupon, the partnership entirely discontinued its business of excavating and selling sand and gravel; and it leased the pit area to another sand and gravel operator named Archie Meade. Thereafter during the period of approximately 10 years extending to September 1957, the partnership made various other contractual arrangements (some formal and others informal) with Meade and his wife and with Meade's wholly-owned corporation, Valley Sand & Gravel Co., Inc., with regard to the partnership's sand and gravel-bearing properties. All these contractual arrangements *192 were expressly designated as "leases," with the parties thereto being designated as "lessors" and lessees." And under the terms of all, the "lessee" was given the right to excavate and remove sand, gravel or related material, from the partnership's properties in indefinite quantities over certain periods of time, in consideration of the payment to the partnership of stated per-cubic-yard prices for the amounts of material that were removed. Subsequently, under the respective dates of September 30, 1957 and March 14, 1960, the partnership entered into two other contractual arrangements regarding its sand and gravel-bearing properties - under each of which the partnership derived income which is directly involved in the instant case. The first of these two last-mentioned contractual arrangements (being that dated September 30, 1957) was entered into with the same parties with which the partnership had previously been dealing, i.e., Archie Meade and his wholly-owned corporation. However, unlike the previous agreements which had been designated as leases, this new agreement was designated a "Contract," with the parties thereto being designated respectively as "Vendors" and "Vendees. *193 " These changes of designation were adopted at the suggestion of Allan Pomeroy (the attorney-partner) with the hope that they would be helpful in having the payments under the agreement treated as amounts received from sales of capital assets. The new agreement provided, in substance: That it would continue for a period of 5 years ending September 30, 1962; that during said period, Meade and his corporation would be entitled to maintain on the property, their sand and gravel handling equipment; and also that during said period, these parties would have the right to excavate and remove sand, gravel, dirt and peat moss from the partnership's property, in consideration of specified per-cubic-yard payments being made to the partnership on a monthly basis for all material actually removed during each preceding calendar month. There was no requirement in the agreement that Meade or his corporation would excavate and remove any definite amount of material during any period; nor was there any requirement that they pay for any material except that actually removed. The agreement did provide in substance: That if any of the real estate involved were condemned for public purposes, the partnership *194 would have the right to cancel the agreement; and that, in any event, the partnership would be entitled to receive the proceeds from any condemnation of any of the property. The second of the two last-mentioned contractual arrangements (being that dated March 14, 1960) was entered into between the partnership and a corporation named Freeway Concrete Supply Company which had theretofore taken over the operation of the pertinent property from the Meade group. The arrangement was designated merely as an "Agreement" and provided in substance: That the Freeway Corporation would "lease" certain of the partnership's sand and gravel properties for a period of 10 years (with provision for possible extensions) for the erection and operation of concrete and asphalt processing plants and equipment; and that also during such period, the Freeway Corporation would purchase from the partnership 50 percent of the corporation's requirements for sand and gravel, in consideration of the latter's payment of "royalties" of certain stated percubic-yard amounts on all materials excavated and marketed. There was no requirement in the agreement that the corporation would excavate and remove any definite amount *195 of material during any period; nor was there any requirement that it pay any royalties or other sums for any sand and gravel other than the amounts actually removed. The agreement did provide: That during the period thereof the partnership itself retained the right to excavate such sand and gravel as it required for the development of its property; that any materials excavated by the Freeway Corporation should be taken only from the areas to be designated by the partnership; and that the partnership would remain responsible for any damage to adjoining properties. On the partnership's return of income for each of its fiscal years ended in 1959 through 1961, it treated all the per-cubic-yard payments which it received for sand and gravel pursuant to the two last-mentioned contractual arrangements, as having been received from sales of capital assets. And each of the partners, in his individual returns, included his shares of the long-term capital gains which the partnership reported. The Commissioner, in his several notices of deficiency herein, determined that the above-mentioned amounts received by the partnership constituted ordinary gross income to the partnership, instead of *196 receipts from sales of capital assets; and he adjusted the incomes of the partners accordingly. Opinion The basic question here presented for decision is a familiar one, to wit: Whether profits realized by a landowner under contractual arrangements with other persons, which gave the latter the right to excavate and remove indefinite quantities of sand, gravel and related materials from the former's property, in consideration of agreed per cubic yard payments for only amounts of material removed - should be classified for income tax purposes as capital gains or as ordinary income. In Samuel L. Green, 35 T.C. 1065 (1961), this Court cited and reviewed numerous cases in which the above question had been dealt with by this and other courts; and it then made the following statement regarding the rule which most of the courts appear to have applied in deciding the question (p. 1070): The rule seems to be that where there is in fact a sale of the material "in place," the owner has sold part of his real estate and any profit realized thereby is therefore not disqualified from being regarded as capital gain by reason of the form of the transaction. See, e.g., Robert M. *197 Dann, supra [30 T.C. 499] at 504, 505 ("in place"); Barker v. Commissioner, supra [250 F. 2d 195 (C.A. 5)] at 196, 197 ("in place"); cf. Crowell Land & Mineral Corp. v. Commissioner, supra [242 F. 2d 864 (C.A. 5)] at 866; n1 Gowans v. Commissioner, supra [246 F.2d 448 (C.A. 9)] at 450, 451, 452. n2 On the other hand, where the owner does not part with his entire interest in the deposits until removed or where he does not sell part of his property "in place," but in effect merely enters into a lease for the exploitation of his land reserving a royalty with respect to the materials extracted or otherwise merely makes arrangements with a contractor to sell the materials at a unit price from time to time as they are extracted and removed from the property, the transaction has not been considered as a sale of a portion of the land entitling the owner to the benefit of the capital gains provisions. See e.g., Charles A. Linehan, supra [35 T.C. 533] at 544, 545, 546, ("in place"); cf. Albritton v. Commissioner, supra [248 F.2d 49 (C.A. 5)] at 51. [Footnotes omitted.] In the foregoing Green case, the Court applied the above-stated rule to the facts revealed by the record *198 there involved. And it then concluded and held that the taxpayers had not made any sales of their property "in place"; and that the profits which they derived in connection with the excavation and removal of materials from their property, were taxable as ordinary income. In the instant case we have concluded, after considering and weighing all the facts established by the record herein, that the present case is not distinguishable in principle from the Green case; and accordingly, that the conclusions and holdings therein made should be here followed and applied. We, therefore, decide the issue before us, in favor of the respondent. By reason of the settlements made with respect to other issues raised in the pleadings. Decisions will be entered under Rule 50. Footnotes
1. The following cases are consolidated here-with: Kenneth J. Romano and June Romano, docket No. 1264-65; Louis Romano and Eleanor Romano, docket No. 1265-65; Robert L. Romano and Jean Romano, docket No. 1266-65; Philip M. Kaufer and Beverly Kaufer, docket No. 1267-65; and Allan Pomeroy and Loretta Pomeroy, docket No. 1269-65.↩