**I. B. GRIFFITH, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 4274.

United States District Court
D. Wyoming.
Jan. 27, 1960.

Loomis, Lazear & Wilson, Cheyenne, Wyo., and Holland & Hart, Denver, Colo., for plaintiff.

John F. Raper, Jr., U. S. Atty., Cheyenne, Wyo., and John J. Kilgariff, Atty., Dept. of Justice, Washington, D. C., for defendant.

KERR, District Judge.

I. B. Griffith, the taxpayer, brings this action pursuant to the provisions of 28 U.S.C.A. § 1346(a), to recover income taxes in the amount of $3,913.50, plus interest, which he alleges were erroneously assessed and collected for the years 1954 and 1955.

The action presents two questions for decision, viz.: (1) Were the amounts received by taxpayer in 1954–1955 in payment for bentonite mined from his property pursuant to four written agreements ordinary income subject to depletion, or should it be treated as capital gains? (2) Did the Internal Revenue Department err in disallowing a total of $540.-27 as automobile and other listed expenses for the years 1954–1955?

The facts relevant to the two issues are not in serious conflict, if in dispute at all, and may be stated as follows:

During the years 1954–1955 the taxpayer resided in Upton, Wyoming, and filed his individual income tax return, 1040, with the District Director of Internal Revenue, Cheyenne, Wyoming.

In his return for 1954 taxpayer listed $6,817.71 as his gross sales for bentonite and in 1955 he listed $16,279.51 as his gross sales from the same source. These amounts were received by taxpayer for bentonite taken from his lands owned by him in Crook and Weston Counties, Wyoming. In both instances the amounts were disallowed by the Internal Revenue Department as long term capital gains and treated as ordinary income, subject to depletion.

The taxpayer is the owner of certain lands in Crook and Weston Counties, Wyoming, upon and under which bentonite was located. Bentonite is a soft porous, moisture absorbing rock composed essentially of clayey minerals thought to be of volcanic origin and used extensively in this modern age in oil well drilling, sealing of dams, foundries, explosives, cosmetics, paint and drugs. Its use is wide and varied.

On May 22, 1937, taxpayer entered into an agreement with the American Colloid Company, a corporation, and under the terms of said agreement taxpayer granted to the corporation the exclusive right to mine and remove bentonite from his lands. The corporation agreed to pay taxpayer twenty cents per ton on all bentonite removed from the premises. The agreement referred to the twenty cents per ton as royalty payments. The agreement further provided that the royalty payments were to be made semi-annually, on the 15th day of January and the 15th day of July, for such bentonite as would be removed from the lands during the full six months period. The corporation

agreed to pay taxpayer a minimum royalty of $250 on each semi-annual payment date whether or not sufficient bentonite would be removed from the lands to account for this sum at the rate of twenty cents per ton. The agreement further provided that it would be in effect for a period from the 22nd day of May 1937 to the year of 1952 with the option given to the corporation to extend the term of such agreement for a period of five years, that is to say, to May 22, 1957. The option was exercised within the time provided by the agreement and its life was extended the additional five year period.

Taxpayer testified that at the time of entering the aforesaid agreement the corporation agreed to mine all of the bentonite on the tract of land described in the agreement. He further testified that it was his intention to sell all of the bentonite on this tract to American Colloid and it was his understanding that "he sold the bentonite to them and they bought all of it in 1937". The taxpayer contends that he retained no title or interest in the merchantable bentonite on this tract of land at the time of entering into this agreement.

The American Colloid did mine all of the merchantable bentonite located in and upon said lands and the taxpayer was paid at the rate of twenty cents per ton for the bentonite mined and removed. This evidence, adduced on the part of the taxpayer, stands uncontroverted in the record of this case.

On December 16, 1946, taxpayer with other joint owners of property containing bentonite, entered into three separate agreements with one Harry Thorson. The agreements are similar in their terms and are substantially the same and will be referred to as the "Thorson agreements". Under the Thorson agreements taxpayer and the other joint owners, named in the agreements, were to receive sixty-five cents per ton for all the bentonite mined and removed. The agreements specifically provided a minimum amount of bentonite to be removed or paid for each year and a yearly maximum amount to be removed. The terms of these agreements is twenty years. At the time the agreements were executed taxpayer and his joint owners knew the property contained bentonite but the exact amount was unknown.

These agreements were drafted by E. C. Raymond and Rodney M. Guthrie, attorneys at law, and co-owners of the bentonite located upon and under said premises.

Taxpayer testified that at the time of entering the three agreements Thorson agreed to remove all merchantable bentonite on the property involved during the life of the agreements. His testimony was fully corroborated by Thorson. He further testified that as of the date of the trial all bentonite had been removed from two of the tracts covered by the Thorson agreements and it is anticipated that all bentonite will be removed from the third tract prior to the expiration of the agreement, which expires in 1966. He further testified that Thorson paid him at the rate of sixty-five cents per ton even though the value of bentonite has varied considerably since the execution of the agreement. He further testified that neither he nor the other co-owners have any right to a percentage of the bentonite mined nor to share in the profits made by Thorson upon the resale of the bentonite. The evidence discloses that taxpayer has sold bentonite only to American Colloid and Thorson. He further testified that prior to the execution of the agreements with Thorson he had been approached by other persons with respect to the lease or sale of bentonite contained on his lands. That he refused to deal with these other parties for the reason they would not agree to buy all of his bentonite.

Several photographs were offered and received in evidence which depict the condition of taxpayer's lands following the mining of his bentonite. These pictures disclose that the "over-burden" is pushed aside on adjacent lands; that bentonite is then pushed into piles, loaded onto trucks and removed, leaving many and numerous open pits. The over-burden

is not returned to the pits nor leveled upon the adjacent land. After the removal of the bentonite the surface is subject to open pits and over-burden piles. The taxpayer testified that vegetation will not grow in open pits or on the over-burden piles.

The taxpayer further testified that prior to bentonite mining operations the land was used for grazing purposes but following the mining the land becomes useless and worthless. He further testified that approximately 220 acres of land mentioned in the Thorson agreements consisted only of pits and over-burden; that other land in the vicinity of his acreage was worth approximtely $12 per acre prior to the bentonite mining but after the mining process the land was sold for $3 per acre.

With respect to question number 2, the taxpayer testified that he was in the business of maintaining real property, renting pasture lands and making loans; that he devoted all of his working time to these activities and that he did not use his vehicle other than for business reasons; that he never used the vehicle for pleasure trips or for vacation purposes.

Section 162 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 162, provides:

"There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *."

Taxpayer itemizes his deductible expenses as follows:

|  | "1954 | 1955 |
|---|---|---|
| Rent on Business Property | $ 39.30 | $ 19.65 |
| Taxes on Business Property | 191.86 | 216.55 |
| Other Business Expenses: |  |  |
| Insurance | 61.97 | 51.97 |
| Car Repair | 51.64 | 93.07 |
| Gas and Oil | 56.14 | 84.42 |
| Anti-rust | —— | 1.00 |
| Prestone | —— | 3.32 |
| Car License | 13.62 | 13.62 |
| Post Office Box | 6.95 | 3.60 |
| Attorney fee | 15.00 | 25.00 |
| Record Mortgages | 12.60 | 11.70 |
| Stenographer | —— | 15.00 |
|  | $449.08 | $538.90." |

The Commissioner determined that the above "Other Business Expenses" for both years and rent for 1955 were personal expenses and added back to income $217.92 for 1954 and $322.35 for 1955. Rent of $39.30 for 1954 and taxes for both years were allowed as claimed. I think the Commissioner erred when he disallowed "Other Business Expenses" and rent for 1955 in the amount of $19.65. The applicable regulation under Section 162, supra, specifically states that among the items included in business expense are operating expenses of automobile used in the trade or business. I am of the opinion that the taxpayer has supported each of the above items by a preponderance of the evidence and that each item is an ordinary and necessary expense in the conduct of his business and should be deducted as a business expense and I so hold.

Having disposed of the second question I now turn to the written agreements to determine the category in which the bentonite must be placed. The gov-

ernment concedes, as indeed it must, if the bentonite was sold in place there is a sale of that interest subject for tax purposes to capital gains.

The Commissioner interprets the agreements as leases, claiming the payments that were made from time to time are "royalties" and construes the entire transaction as a mining operation subject to depletion.

The Court must look beyond the mere phraseology of the agreements and determine their substance. The Colloid agreement provided the payment of $250 "royalty" every six months whether or not sufficient bentonite would be removed from said premises to account for this sum at the rate of twenty cents per ton. Under the agreement this amount was due each six months whether bentonite was mined or not. True, the semi-annual payments were to be applied on the sale of the bentonite removed. Similar language is used in the Thorson agreements except the initial payment and annual payments were much greater. Under the terms of the agreements the taxpayer would have benefited had no bentonite been removed from the premises at all.

In a long line of decisions beginning with Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489, the underlying principles governing the income tax consequences involving natural deposits have been set forth by the Supreme Court; Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Burton-Sutton Oil Co., Inc. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062; Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347. Under these decisions notwithstanding the terminology of the contract the transaction is to be considered a sale if the consideration is payable to the grantor without respect to the production and sale of the mineral. On the other hand, regardless of the wording of the contract, where the consideration payable to grantor depends *solely* upon the extraction and sale of mineral, the owner is said to retain an economic interest, and therefore his proceeds from the transaction are to be reported as regular income, subject under certain conditions to a deduction of a percentage depreciation allowance.

It would be most difficult to distinguish the case at bar from Barker v. Commissioner, 2 Cir., 250 F.2d 195. Judge Medina speaking for the court said at pages 196–197 of 250 F.2d:

"The Commissioner interprets the agreement as a lease, claims the payments made from time to time are 'royalties', and would have us view the case as in the nature of a mining operation in which minerals and natural deposits are recognized as wasting assets subject to depletion.

"We turn to the agreement. It provides that Mrs. Barker 'contracts to sell the sand and gravel and hereby sells same' on her property to Steers in consideration of Steers' promise to pay $10,000 at the time of signing the agreement, six cents per cubic yard for the gravel extracted, but no less than $3,000 quarterly regardless of the amount of material actually taken. The $10,000 original payment was to be applied against any quarterly extractions in excess of 50,000 cubic yards made by Steers and there was an averaging clause which provided that by the time of the termination of the agreement Steers would 'not be required to pay for an amount of material averaging more than fifty thousand (50,000) cubic yards for each quarterly period at the rate fixed during the period of the Agreement, unless the total amount of material actually removed exceeds that aggregate'. The agreement explicitly stated that Steers was not required to remove any amount of sand or gravel, although the $3,000 minimum quarterly payments would still be due. Steers could terminate the contract, upon notice, whenever in its judgment, exercised in good faith, there remained no sand or gravel of the grade it was extracting, otherwise

the agreement was to be in force for 15 years, and the company had an option to extend it for another 10 years."

Again at page 198 of 250 F.2d:

"Analysis of the cases relied upon by the Tax Court in this case merely confirms the conclusion that the payments received by Mrs. Barker were long term capital gains. In *Otis A. Kittle*, 21 T.C. 79, the contract, which concerned the exploitation of the Rust Mine Lands, was by its terms a 'lease' and the payments were designated as 'royalties'. The various provisions relating to the proposed operation made it abundantly plain that the words thus used accurately reflected the intention of the parties and the substance of the transaction entered into by them."

Under a similar contract to those involved in this controversy which provided for the sale of sand and gravel the Fifth Circuit held in *Crowell Land & Mineral Corporation v. Commissioner*, 242 F.2d 864, the fact that all of the unused sand and gravel would revert to the owner after five years did not make the payments royalties. At page 866 of 242 F.2d Chief Judge Hutcheson stated:

"A bona fide sale was the intent of the parties and it was expressed in terms free from ambiguity throughout the instrument in the provisions and conditions it set out. Looking to the actual circumstances as well as the language of the contract of sale, there is no occasion or basis for resorting to legal niceties of interpretation to defeat the basic purpose and effect of the transaction. Crowell did indeed have the possibility of a reverter within the five year period upon the terms set out in the contract, together with the right to a reconveyance at the end of the five years, but these provisions in no manner detract from the effect of the instrument as a whole as constituting a sale and entitling the sale of a capital asset to capital gains treatment.

"The provision for reverter and retransfer at the conclusion of the five year period did not necessarily mean that any sand and gravel would revert or be retransferred. In fact, it was all removed and the area covered with water, rendering it useless. Reverter ipso facto, to be followed by reconveyance by the vendee if certain provisions were not complied with, was in the nature not of the retention of an economic interest by way of royalty but of a vendor's lien to protect the payment due Crowell.

"Neither the method of payment, based upon the amount of the deposit removed at specified intervals during the five year period the vendor had in which to effect removal, nor the provisions for reverter and retransfer can be regarded as indicia of or analogous to a mineral lease so as to permit the payments made by the vendee under the sale contract to be regarded and treated as payments of royalty rather than, as they were intended to be and were, installment payments on the price.

"The judgment of the Tax Court is reversed for further proceedings in accordance herewith."

In a recent Tax Court case, *Robert M. Dann*, 30 T.C. 499, the court held a sale of usable soil had taken place even though the purchaser was obligated to pay only for the materials when removed. In its findings of fact the Tax Court said at page 503 of 30 T.C.:

"After execution of the above-described agreements between Lane and petitioners, the latter retained no economic interest in the usable soil contained in the tracts of land therein described. The parties intended to, and did, effect completed sales of all the usable soil in place, within specified areas and at specified cubic yard prices."

In considering this case I am not unmindful of Section 613 of the Internal

Revenue Code of 1954, 26 U.S.C.A. § 613. This Act authorizes a depletion of 15% on all bentonite mined. The contract with Colloid was executed many years prior to this enactment allowing a depletion on bentonite. The contracts with Thorson were likewise entered into and much of the bentonite was removed prior to the effective date of this Act. If the taxpayer has taken a depletion on a portion of the bentonite removed this can be adjusted in a recomputation of the tax. The record of the case is not clear as to whether the taxpayer took a depletion on his bentonite sold subsequent to the enactment of this law. There is nothing in this Act which prohibits the owner from selling his bentonite in place.

In determining whether the taxpayer intended to and did sell all of his bentonite under these agreements it is well to refer to the testimony. The taxpayer testified respecting the agreement with Colloid as follows:

"Q. As a result of all of the discussions with the American Colloid officials in May of 1937, did you have an understanding with the Company as to whether or not the company would remove all of the merchantable bentonite during the agreement term? A. I sold them all the bentonite, and they agreed to remove it and they did remove it all.

"Q. Does any merchantable bentonite remain on this 320 acres at this time? A. I already answered that. Not that I know of. They say 'no'. I don't know of any.

"Q. Have you sold any bentonite from this 320 acres to American Colloid or anybody else since the American Colloid agreement terminated in 1957? A. No.

"Q. Did you have an understanding as to whether or not you retained any title to or interest in the merchantable bentonite contained on this 320 acres after entering into the American Colloid agreement in 1937?

* * * * * *

"Q. (By Mr. Tomlinson) Did you have an understanding as to whether or not you retained any title to or interest in the merchantable bentonite contained on this 320 acres after entering into the American Colloid agreement in 1937? A. Yes, sure; I sold the bentonite to them and they bought it, all of it."

With respect to the agreements with Thorson the taxpayer testified:

"Q. Will you please relate to the Court what went on at that conference? A. Thorson and I had made a tentative agreement before we went there, subject to the approval of the other parties, and we met there that day and spent practically the whole day, and it was dark before we were through, writing that contract, drawing that contract.

"Q. Did you or anybody else, to your knowledge, know in December of 1946 exactly how many tons of bentonite this acreage contained? A. No.

"Q. Did you have an understanding with Mr. Thorson in 1946 as to whether he would remove all of the merchantable bentonite during the agreement term or whether some of the merchantable bentonite would or might remain at the end of the term? A. No, he agreed to move it all."

Mr. Thorson testified on direct examination as follows:

"Q. Now, was there any discussion or understanding or agreement as to whether or not you would remove all of this bentonite within the agreement term? A. Yes. I felt that 20 years would be adequate time to remove all of the bentonite.

"Q. And at that time in 1946, did you anticipate removing all of this bentonite? A. Yes, sir, all of the marketable bentonite.

"Q. And what is the factual situation today in 1959 with respect to this bentonite? A. We have removed most of the marketable ben-

tonite on two of the contracts and there is a considerable amount left on one of them.

"Q. If your present operations continue, will all of the bentonite be removed prior to 1966? A. Yes, sir."

The above testimony stands uncontroverted in the record of this case.

In short, the evidence shows that the taxpayer intended to and did sell all of the bentonite located on and under the premises described in the agreements. Mr. Thorson's testimony is conclusive that he intended to and did purchase all of the bentonite on and under the premises described in his contracts.

 I think that an analysis of the agreements, the evidence and a reasonable inference to be drawn from the evidence, completely rebuts the government's theory that the arrangements was one of lease, under which taxpayer retained an economic interest in the bentonite. The evidence clearly discloses a bona fide sale was the intent of the parties. If the contracts were ambiguous with respect to a sale the ambiguity was removed by the testimony. The taxpayer had a right to explain the operation of the agreements, as was well stated by Judge Phillips in American Crystal Sugar Co. v. Nicholas, 10 Cir., 124 F.2d 477, at pages 479 and 480:

"Here, the United States was a stranger to the contract. It asserts a tax liability, not a claim derived from either party to the contract, and it could not invoke the parol evidence rule.

"Furthermore, the parol evidence rule is subject to a great number of well-recognized exceptions. One is that parol evidence may be received, not to contradict or vary the terms of the written contract, but to explain how it is to be carried out."

From what I have said I hold that the sale of bentonite and the amounts received by taxpayer pursuant to the agreements represented capital gains from the sale of capital assets.

The proper amount of the judgment is left to the agreement of the parties upon a recomputation of the tax.

Attorneys for the taxpayer will prepare findings of fact and conclusions of law, together with judgment, in accordance with this memorandum and submit the same within twenty-five (25) days from the date hereof and the clerk will enter an order accordingly.