Charles A. LINEHAN et al., Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 5831.

United States Court of Appeals
First Circuit.

Dec. 15, 1961.

James D. Dow, Boston, Mass., for petitioners.

David O. Walter, Atty., Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen. and Meyer Rothwacks, Atty., Dept. of Justice, Washington, D. C., on the brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This petition to review a decision of the Tax Court of the United States presents a question of the proper tax treatment of amounts received under contracts permitting removal of sand and gravel from a taxpayer's land. There is no real dispute over the facts, some of which are stipulated.

The petitioners are husband and wife who filed joint income tax returns for the years involved, 1953, 1954 and 1955. The husband, Charles A. Linehan, to whom we shall refer hereinafter as petitioner or taxpayer, was a full time teacher for 44 years until he retired in 1957. At the times pertinent he owned an approximately 17 acre tract of land in Lexington, Massachusetts, containing deposits of sand and gravel. Since the property was zoned for industrial use, he decided to sell the sand and gravel on it down to the level of the access street, which was 125 feet above sea level, and then offer the entire tract as a whole for development for industrial purposes.

In 1949, in prosecution of his plan the taxpayer entered into an oral agreement with Highland Sand and Gravel Company, a "big concern" having sand and gravel property near by and machinery for processing that material on its property whereby the latter excavated sand and gravel from the taxpayer's property at a fixed price per cubic yard down to an

elevation of 125 feet above sea level. The amount taken was determined by quantity survey.

Highland immediately removed sand and gravel from the taxpayer's property, took the material to its own plant for processing, and thereafter presumably sold it, and continued to do so until April 1952 when, nearing the end of its operations, it started to remove sand and gravel constituting lateral support of a contiguous property not owned by the taxpayer. This caused considerable controversy between the owner of the contiguous property, the taxpayer and Highland, and resulted in cessation of operations by the latter leaving approximately 4 acres of the taxpayer's property with sand and gravel deposits on it above the 125 foot level.

No more material was removed from the taxpayer's land until 1954 when he and the owner of the adjoining tract agreed to permit the removal of sand and gravel across their common property line. Upon reaching that agreement the taxpayer entered into two written contracts, one in May 1954 and another in December of that year with Wes-Julian Construction Corporation, which was in need of sand and gravel in the prosecution of work it had undertaken under contract with the United States on an airport near by.

These contracts are alike in that they are couched in terms of exclusive "right to remove" sand and gravel from the taxpayer's land, provide for the payment of fixed prices per cubic yard for material removed above a given level, in one instance 128 feet above sea level and the other 125 feet above sea level, and provide that the amount of material removed shall be determined by quantity survey. They differ in that the first one requires an advance payment by Wes-Julian of $1,000 as liquidated damages in the event that it should fail to remove $5,000 worth of sand and gravel and in that the second one requires Wes-Julian at a lesser price per cubic yard to fill an approximately 2 acre depression on the property left by a prior excavation. Wes-Julian removed all the sand and gravel included in the contracts except a small portion on one side of the property, the removal of which would have taken away the lateral support of adjacent land not owned by the taxpayer. The Tax Court found that further deposits of sand and gravel remained on the property after removal of all that material above the 125 foot level, and that the property was far more valuable after the deposits were removed than it had been before.

The taxpayer in his returns for the years in question treated his net receipts from the extraction of sand and gravel from his property by Highland under the oral arrangement and by Wes-Julian under the written contracts as receipts from the sale of long term capital assets and therefore as long term capital gains. The Commissioner disagreed. He determined that the taxpayer's receipts were ordinary income but allowed deductions therefrom of 5% of gross receipts as percentage depletion and assessed deficiencies accordingly. The Tax Court, three judges dissenting, agreed with the Commissioner. We do not agree with the Tax Court.

■■■ The allowance for depletion, which has long been recognized in the revenue laws, is based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit. Commissioner v. Southwest Exploration Co., 350 U.S. 308, 312, 76 S.Ct. 395, 100 L.Ed. 347 (1956). Therefore, as the Court had previously pointed out in Kirby Petroleum Co. v. Commissioner, 326 U.S. 599, 603, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946), it follows from this theory " * * * that only a taxpayer with an economic interest in the assets," in that case oil, "is entitled to the depletion." In this connection the Court pointed out that technical title to the deposit in place is not important, for that may depend upon the law of the state in which the property lies. "Economic interest," it said on the following page of its opinion in 326 U.S. at page 411 of 66 S.Ct., "does not mean title to the oil in place but the possibility of profit from

that economic interest dependent solely upon the extraction and sale of the oil."

Applying these general principles to the facts before it the Court determined that the landowners-taxpayers were les-. sors who had an "economic interest, a capital investment" in the oil after extraction by the persons to whom they had granted exploitation rights, not only because the parties were so denominated in the agreements but also because the consideration paid by the exploiters, called bonuses and royalties, was based upon the net profits accruing to them as a result of their operations. The Court at page 607, 66 S.Ct. at page 412 summarized its opinion as follows:

> "In our view, the 'net profit' payments in these cases flow directly from the taxpayers' economic interest in the oil and partake of the quality of rent rather than of a sale price. Therefore, the capital investment of the lessors is reduced by the extraction of the oil and the lessors should have depletion."

■ While Kirby Petroleum, supra, was concerned with the narrow issue of deductibility of the depletion allowance for the extraction of oil, gas, and other minerals, the general principles upon which the case rested provide the touchstone for decision of the present problem of whether these agreements yielded ordinary income or capital gains. We do not gather from Kirby that decision in cases like this turns entirely upon whether a given transaction between a landowner and his grantee of the right to exploit mineral deposits on his land is technically a lease or a sale. Whether a given transaction is clearly one or the other may be indicative of the result but is not necessarily determinative. Indeed, should the test be whether a transaction is strictly speaking a "sale" or a "lease" we would be at a loss to know how to decide this case, for the contracts under consideration are in terms of "right to

remove." They are not couched in terms of purchase and sale as in Crowell Land & Mineral Corp. v. Commissioner, 242 F.2d 864 (C.A.5, 1957). Nor do the contracts describe the parties as lessor and lessee and denominate the remuneration given for the sand and gravel as a royalty as in Albritton v. Commissioner, 248 F.2d 49 (C.A.5, 1957). But cases like this do not turn upon the use of words alone unless it is abundantly clear that the words used by the parties were chosen with precision and accurately reflect their intention and the "true substance" of the transaction entered into between them. See Barker v. Commissioner, 250 F.2d 195, 197 (C.A.2, 1957).

■ Turning then to the "true substance" of the transactions between this taxpayer and those to whom he gave the right to remove sand and gravel from his property, it is evident that the taxpayer had no "economic interest" in the material taken from his property after its severance, for in every instance he sold sand and gravel for fixed prices per cubic yard without reference to the prices received or the profits, if any, made by the exploiters.[1]

In this respect the case at bar is similar to Crowell Land & Mineral Corp. v. Commissioner and Barker v. Commissioner, and clearly distinguishable from Albritton v. Commissioner. Also it is similar in this respect to Dann v. Commissioner, 30 T.C. 499 (1958), which in the case at bar the Tax Court undertook to distinguish on a number of, to us, quite irrelevant factual grounds such as that in this case the taxpayer's property was worth more after the extraction of the sand and gravel on it whereas the opposite was the case in Dann.

■ Judge Murdock in his dissenting opinion in this case put the matter in a nutshell saying:

> "The present case is not distinguishable from the Dann case or

1. The fact that under the Wes-Julian contracts payment for the sand and gravel was not to be made until after the excavator received payment from the United

States under the contract it had entered into with the latter for the construction of a nearby airport goes only to the time of payment, not to the price paid.

from other of the cases cited above. The petitioner sold the material for a fixed price per unit removed. Nothing was to vary that price or the vendee's obligation to pay it. Petitioner was in no way to benefit from the removal of the material except by the payment of a fixed price per unit. Particularly, he was not to share in any profit or income derived by the vendee from the removal of the material. It should be held on these facts and on the authority of the prior opinions that the gain here involved should be taxed at capital gain rates."

We agree with Judge Murdock.

Judgment will be entered reversing the decision of the Tax Court of the United States and remanding the case to that Court for further consistent proceedings.