W. W. OLIVER, Individually and as Personal Representative of Alice L. Oliver, Deceased, Bayside Borough, Virginia Beach, Virginia, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 5619.

United States District Court
E. D. Virginia,
Norfolk Division.

Nov. 29, 1967.

Joseph H. Thibodeau, Department of Justice, Washington, D. C., for defendant.

Montgomery Knight, Doumar, Pincus, Anderson & Knight, Norfolk, Va., for plaintiff.

## MEMORANDUM

MacKENZIE, District Judge.

The plaintiff, W. W. Oliver, had been a farmer in Princess Anne County, Virginia, for more than forty years when he purchased, in 1945, a 41 acre "Bailey Tract" adjacent to his other holdings. He purchased the property as a residential real estate investment.

Several years thereafter, from a well defined area, 1200 feet long and varying from 250 feet to 300 feet in width, he sold fill dirt, but that venture was never satisfactory and the area was left in an uneven and spotty condition. The Board of Supervisors of Princess Anne County brought pressure on Oliver to do something about this dangerous and unsightly condition.

In 1960, when plaintiff was under the pressure from county officials, Tidewater Sand Company, Incorporated, without any solicitation from Oliver, and after its own independent investigation, expressed to him an interest in the sand in the same area where the previous fill dirt operation had been marked off ·by stakes. These negotiations resulted in a written contract dated January 22, 1960.

Under the contract, 250,000 tons of sand were removed and paid for during 1960, 1961, and 1962. Oliver and his wife reported the proceeds of this contract as capital gains on their joint income tax returns for 1960, 1961 and 1962. The Government disallowed the capital gains treatment and charged the sales proceeds as ordinary income. The taxpayer paid an additional tax assessment and sues for a refund of such extra tax paid for the three years in question. It is stipulated that the total amount in issue is $5,582.73, plus appropriate interest if the taxpayer prevails.

\* \* \*

There are some thirty or forty cases bearing on this subject, all of which have been read and considered, and some of which will be commented upon, but about the most succinct statement is found in Johnson v. Comm'r., 32 P-H Tax Ct.Mem. 1910 (1963) in which the Court said at page 1914:

"An attempt to reconcile the cases simply leads one to the conclusion that some courts give more weight to certain factors than do others in applying the rule".

"The rule", by the way, is also subject to debate, but for the purposes of this decision is stated to be: was the contractual arrangement *in this case* a sale of the sand, or an agreement for extraction on a royalty basis? Legalistically stated, did Oliver retain an "economic interest" in the sand after the signing of the agreement? Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (5 Cir. 1933).

Perhaps the reason why the decisions in this field are confusing is that there are available two absolutely opposite tax-saving approaches. If the taxpayer has chosen the "depletion allowance" for a tax advantage he argues vehemently that he has retained (which he must) an "economic interest" while on the same set of facts if the taxpayer chooses the "capital gains" treatment for his tax advantage, he just as vehemently disclaims (as he must) the retention of any "economic interest".

\* \* \*

In this case, the Court concludes that the arrangements between Oliver and Tidewater Sand Company, Incorporated, was a sale, and that the plaintiff is entitled to the refund claimed.

\* \* \*

While the nature and substance of the written contract dated January 22, 1967 is the true test rather than form, the language of this particular contract is more than persuasive. Such is not always the case, see Green v. United States, 16 Am.Fed. Tax R. 5332 (N.J.Sup.Ct.1963), but it is an element for consideration, Barker v. Comm'r. of Internal Revenue, 250 F.2d 195 (2 Cir. 1957).

(1) This agreement states that "\* \* the *vendors* hereby agree to sell and the *vendee* hereby agrees to *buy*, and *remove all* sand, gravel and other suitable and marketable materials \* \* \* " (italics added). This is the language of a sale, not a lease, see Dann v. Comm'r., 30 T.C. 499 (1958), Crowell Land and Mineral Corporation v. Comm'r. of Internal Revenue, 242 F.2d 864 (5 Cir. 1957).

(2) "The Vendee agrees to pay the Vendors the sum of Eight (8¢) Cents per short ton \* \* \* for all materials removed from said pit by it for sale". This language from the contract brings into sharp focus two items that Courts have found important in the decisions in point. First, the price is fixed for the entire, definite life of the contract, and second, there is no profit sharing involved. Dann v. Comm'r., supra; Crowell v. Comm'r., supra; Griffith v. United States, 180 F.Supp. 454 (D.C.Wyoming 1960); Linehan v. Comm'r. of Internal Revenue, 297 F.2d 276 (1 Cir. 1961). Profit sharing was a basis of the decision in Comm'r. of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956). And a minimum royalty payment was persuasive in Wood v. United States, 377 F.2d 300 (5 Cir. 1967). In no event, does Oliver have any interest in the price received by the Sand Company in its resale, and, in this case, the parties have also testified, without equivocation, that Oliver, further, had no other interest as to who the buyer was or whether the Vendee was paid by such buyer at all.

As a matter of fact, the parties to the agreement have both testified that the reason for the use of the language quoted above " \* \* \* to buy \* \* \* marketable materials \* \* \* " and "to pay \* \* \* Eight (8¢) Cents per ton \* \* \* for all materials removed \* \* \* for sale. \* \* \* " was for the very real reason that much of what the Vendee was obligated to remove from the pit, such as the overburden, blue mud and dirt, was not to be paid for by the Vendee (though he had to remove it) and could be disposed of by the Vendee by either piling it on the adjoining property or disposing of it as he saw fit. It was therefore only the saleable material (in this case the sand), which commanded the price of Eight (8¢) Cents per ton. Johnson v. Commissioner, supra.

And what better way to keep a record of the "saleable" material than, as the contract suggested, require the Vendee to keep a record of the actual sales made by it. Bear in mind, also, that the Vendor was immediately paid (by the 15th of the succeeding month) for the total tonnage disposed of by Vendee by sale during the previous month without regard to the name of the buyer, or the price charged, or the time or type of delivery, or to credit extended, or to collections made by Tidewater Sand Company, Incorporated, or if any charge at all was made by them.

Not only did the sales slips of Tidewater Sand Company, Incorporated provide the evidence of "salability" as required under the terms of the contract, but, in addition, these slips likewise provided the information as to quantity. The evidence was that the dredging operation went on continuously, piling up stockpiles of sand along the bank of the pit. This phase of the operation did not lend itself to an accurate measurement of the tonnage actually removed from the ground. The capacity of the trucks used by Tidewater Sand Company, Incorporated, however, could and did provide the tonnage

figure monthly as they hauled the stockpile away. A witness testified that the accuracy of the truck capacity was checked and verified.

In other words, this original agreement was nonetheless a sale simply beacuse the parties used as a test of "salability", an analysis as measured by the actual sales made by the sand company, and the quantity analysis as determined by the capacity of the sand company's trucks as actually used.

It is argued that Oliver retained an economic interest because the contract provisions allowing a cancellation by Tidewater Sand Company, Incorporated under certain conditions. Let us examine those conditions.

"3. Vendee shall remove materials to a depth of at least six feet below water level. * * * "

"10. It is further understood that if Vendee finds that the materials recoverable from said pit are for any reason unsaleable at a price sufficient to recover its costs and a reasonable profit, it may * * * cancel this contract. * * * "

Clause 3 burdens the Sand Company to remove materials (not just sand) to a depth of six feet below water level, a fully enforceable contract requirement. A cancellation (Clause 10) is not a right exercisable by the Vendee at will, or in any event, but only on certain conditions and the agreement sets up a cancellation test applicable to the Eight (8¢) Cents per ton sales price meeting of a cost plus reasonable profit figure. Such a test is fully determinative. There is no lack of mutuality.

And as to whether the parties to the contract contemplated that it required the Sand Company to remove all of the material in the designated area, the Court can look also to those cases which have applied a "hindsight" test—to see what was actually done. (Dann v. Comm'r., supra; Griffith v. United States, supra). All of the material required to be removed to the point six feet below water level was actually removed (250,000 tons of which was sand) except about 200 tons, which, if all sand, would have amounted to only $16.00 for which Oliver was not reimbursed.

Another test suggested by the decisions is whether the contract requirements are to be completed within a certain time. In the instant case, the contract provides that the material is to be removed within two years and four months. There are provisions for an extension, but these need not be considered here.

The actual provisions in the contract for the removal of all materials from the area—two years and four months—an apparent odd period of time, came about by the estimate of the Sand Company officials that the removal of that much material would take exactly that much time. Here again the "hindsight" test proves the point. All of the material, except 200 tons, estimated to require only two or three days work to remove, had been removed by early March, 1962—two years and two months after the agreement was signed. By way of explanation, the pit was flooded in the Ash Wednesday hurricane in March, 1962 and this prevented the last two or three days work.

As to other tests suggested, suffice it to say that Oliver was a farmer and did not buy this property for mineral exploitation [emphasized in Dann v. Comm'r., 30 T.C. 499 (1958)]. The content of the soil for sand was not a matter he ever knew or tested for. The actual area involved is now completely inundated and valueless in itself (a test applied in Griffith v. United States, D.C., 180 F.Supp. 454).

It is also uncontroverted that a primary reason for the contract with the Sand Company was to comply with the political pressure and remove the unsightliness by considerable work of grading slopes for which Oliver agreed to pay one-half the cost. This obligation pertained in part even in the event of a cancellation. Thus, the contract had other reasons for existence other than the removal of the sand, in re the Linehan v. Comm'r., supra, rationale.

The case of Wood v. United States, 377 F.2d 300 (5 Cir. 1967) relied on heavily by the Government, is clearly distinguishable. There the contract between Wood and the Sand Company was entitled: SAND, GRAVEL AND ROCK LEASE, whereby Wood did "grant, lease and let" to the sand extractor the exclusive right to mine sand, gravel and rock on a 14,088 acre ranch for an indefinite period. The sale was on a royalty basis. Specifically, by contract, all material processed remained the property of Wood until removed from the property. This the Court said was a "typical" mineral lease. The case at bar is just as "typical" a sale. The language here is so couched, unlike Wood; the period of removal was definite, and short termed, unlike Wood; the vendee was legally obligated to remove all material within an 8½ acre designated area, unlike the generality of Wood on a 14,088 acre location; the taxpayer was paid a fixed price per ton during the contract, while in Wood, the extractor paid a royalty of twenty-five (25¢) cents per cubic yard, but this price was subject to change; in Wood the income was based solely on production, while in the instant case the sand company was obligated to remove all the material (the attention to the "resale" of sand being simply a tool to measure the saleable material).

In Wood v. United States, supra, the Court distinguishes Wood from Linehan v. Comm'r. of Internal Revenue, 1 Cir. (1961), 297 F.2d 276, saying that in Linehan the gravel company was obligated to remove all of the sand and gravel down to a specific grade, and that the taxpayer had in mind as his primary pursuit, the lowering of the grade of the land for another use. This language fits the case at bar—the sand company was obligated to remove all material to a grade of six feet below water level in a small area in which a primary concern was to relieve the criticism being levelled against him by the local county board of supervisors and their pressure for him to clean up the area.

Under the factual situation here pertaining, we hold this agreement to have

been a sale, not a lease, and that the taxpayer was entitled to treat the proceeds as capital gains. A proper judgment order, under this memorandum, in favor of the plaintiff for $5,582.73, with appropriate interest, will be prepared and presented by the plaintiff, after endorsement by defendant, whose proper exception will be noted.